UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

CASE NO.: <u>CV 10-09150 SJO (MANx)</u>   DATE: <u>August 22, 2012</u>

TITLE:   <u>Ines Ibrahim v. Bayer Corporation Disability Plan, et al.</u>

========================================================================
PRESENT: THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE

Victor Paul Cruz                                   Not Present
Courtroom Clerk                                    Court Reporter

**COUNSEL PRESENT FOR PLAINTIFF:**          **COUNSEL PRESENT FOR DEFENDANT:**

Not Present                                        Not Present

========================================================================
**PROCEEDINGS (in chambers): FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The instant case arises under the Employee Retirement Income Security Act of 1974 ("ERISA"). On November 29, 2010, Plaintiff Dr. Ines Ibrahim ("Plaintiff") filed her Complaint against Defendant Bayer Corporation Disability Plan ("Defendant"). (*See generally* Compl., ECF No. 1.) On March 16, 2012, Plaintiff and Defendant filed their Opening Briefs. (*See generally* Pl.'s Opening Br., ECF No. 15; Def.'s Opening Br., ECF No. 13.) On April 9, 2012, Plaintiff and Defendant filed their Responding Briefs. (*See generally* Pl.'s Responding Br., ECF No. 17; Def.'s Answering Br., ECF No. 16.) On April 23, 2012, Plaintiff and Defendant filed their Reply Briefs. (*See generally* Pl.'s Reply Br., ECF No. 18; Def.'s Reply Br., ECF No. 20.)[1] The Court found this matter suitable for disposition without oral argument and vacated the trial date set for May 8, 2012. *See Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999) (en banc) ("[T]he district court may try the case on the record that the administrator had before it."). The parties also submitted the bench trial for decisions on the briefs. (*See* Min. Order in Chambers 1, Dec. 22, 2011, ECF No. 11.) Having carefully reviewed the administrative record and the arguments of counsel, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. *See* Fed. R. Civ. P. 52(a)(b)(c). Any finding of fact that is more appropriately deemed a conclusion of law, or vice versa, is so deemed. For the reasons discussed below, the Court enters judgment in favor of Defendant.

I.    <u>FINDINGS OF FACT</u>

1.    Bayer Corporation ("Bayer") is the designated plan administrator and fiduciary of the Bayer Corporation Disability Plan (the "Plan"). (Decl. of Jennifer Walsh on Def.'s Opening Br.

---

[1] Defendant filed its Reply Brief seventy-two minutes after the deadline; however, because Defendant's failure to file was due to excusable neglect, Defendant's Ex Parte Application for Court to Consider Its Reply Brief is GRANTED. (*See generally* Def.'s Ex Parte Appl. for Ct. to Consider Its Reply Br., Apr. 27, 2012, ECF No. 23.)

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.:   CV 10-09150 SJO (MANx)            DATE:   August 22, 2012

       ("Walsh Decl.") Ex. A (the "Plan Articles") BAY256, Mar. 26, 2012, ECF No. 14-1.)  Bayer funds all short-term disability ("STD") benefits paid out under the Plan.  (Plan Articles BAY256.)

2.    Bayer has "the exclusive right to make any finding of fact necessary or appropriate for any purpose under the  Plan[] including, but not limited to, the determination of the eligibility for . . . any benefit payable under the Plan[]."  (Plan Articles BAY257.)  Bayer also has "the exclusive discretionary right to interpret the terms and provisions of the Plan[] and to determine any and all questions arising under the Plan[] or in connection with the administration thereof . . . ."  (Plan Articles BAY257.)

3.    Bayer may appoint individuals "to act on its behalf."  (Plan Articles BAY256.)  Bayer has allegedly delegated its authority to administer the Plan[] to Bayer Corporate and Business Services LLC ("BCBS").  (Walsh Decl. Ex. F (the "ERC Articles") BAY430, Mar. 26, 2012, ECF No. 14-4.)

4.    BCBS has hired The Prudential Insurance Company of America ("Prudential") to serve as the "third party administrator," which determines the initial eligibility of any new claim under the Plan.  (Walsh Decl. Ex. C (the "Admin. Servs. Agreement" ("ASA"))  BAY381-426, Mar. 26, 2012, ECF No. 14-4.)  Prudential receives a monthly fee and compensation based on the total number of covered employees; Prudential does not receive financial incentives to deny claims.  (ASA BAY416-17.)  Under the terms of the ASA, BCBS retains complete authority over the administrative appeals process.  (ASA BAY391.)

5.    BCBS organized the ERISA Review Committee (the "ERC") to "adjudicate disputed claims" after Prudential has terminated a claim and the employee has filed an appeal.  (ERC Articles BAY430.)  Although the ERC Members are BCBS employees or directors,[2] they do not receive a salary for their services to the ERC.  (ERC Articles BAY430, BAY432.)

6.    Under the terms of the ERC Articles, ERC Members are allegedly invested with BCBS's "full discretionary authority" for ERC purposes.  (ERC Articles BAY434.)  In addition:

> the Members . . . may rely in good faith upon information, opinion, reports or statements, prepared by (i) one or more employees or officers of [BCBS] whom the Members reasonably believe to be reliable and competent in the matters presented, or (ii) legal counsel, public accountants, physicians,

---

[2] The record does not specify the ERC's exact composition, but the ERC Articles state that Members must be BCBS (or affiliate) employees or directors.  (ERC Articles BAY430.)  Neither Plaintiff nor Defendant alleges that the ERC is otherwise composed.

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:** CV 10-09150 SJO (MANx)      **DATE:** August 22, 2012

      insurance company claims reviewers, or other persons as to matters which Members reasonably believe to be within the professional or expert competence of such person.

    (ERC Articles BAY434.)

7.     BCBS reserves the right to determine if an employee is "disabled" under the terms of the Plan. (Walsh Decl. Ex. B (the "Summary Plan Description" ("SPD")) BAY354, Mar. 26, 2012, ECF Nos. 14-2, 14-3.) If conflicting medical opinions exist, BCBS reserves the right to determine which opinion "more plausibly or credibly assesses" the employee's condition. (SPD BAY354.)

8.     To qualify as "disabled," the Plan requires that: (1) the employee be "under the care of a physician whose speciality or experience is appropriate" to the condition; and (2) "based on objective medical evidence" of the illness or injury, the employee cannot do his or her job. (SPD BAY354.) In determining whether an employee is disabled, BCBS may take into account "the possibility of reasonable accommodations or the availability of medication, surgery, or other forms of treatment" that would permit the employee to perform his or her job functions. (SPD BAY354.) "Disability" excludes "employment-related mental or emotional disabilities." (SPD BAY353.)

9.     Plaintiff was employed by Bayer as a "medical liaison" and is covered by the Plan. (Admin. R. ("AR") BAY14, BAY50, Mar. 21, 2012, ECF Nos. 12-1, 12-2, 12-3, 12-4.)

10.    On December 8, 2007, Plaintiff's doctor, Ian Yip, reported that Plaintiff had symptoms of fibromyalgia, fatigue, weight gain, and irritable bowel syndrome ("IBS"). (AR BAY14.) Over the next six months, through May 22, 2008, Dr. Yip observed Plaintiff several more times and reported symptoms of exacerbated fibromyalgia, insomnia, chronic fatigue, and lack of concentration. (AR BAY14-28.) Dr. Yip prescribed rest, stress reduction, improved diet, physical therapy three times per week for six weeks, psychotherapy (for the fatigue), and Lyrica (a neuropathic painkiller to treat the fibromyalgia). (AR BAY14-28.) Throughout this six month period, Plaintiff reported substantial pain. (AR BAY14-28). On March 18 and April 24, Plaintiff was feeling "slightly better." (AR BAY26-27.) The Lyrica seemed to help. (AR BAY26.)

11.    From February 14, 2008 through May 19, 2008, Plaintiff attended twenty-two physical therapy sessions at Gillette and Associates Physical Therapy ("Gillette"). (AR BAY7-13.) The reports from Gillette are mixed. On February 28, Plaintiff had "no energy" and was "unable to do housework"; throughout February, Plaintiff was "progressing gradually" and "tolerating [the treatment] well." (AR BAY10-11.) On March 20, Plaintiff had been "miserable" for two days after the last visit but felt "better" that day. (AR BAY11.) Plaintiff "tolerated [the treatment] well" and "respond[ed] well" throughout March and April.

**CASE NO.:** CV 10-09150 SJO (MANx)          **DATE:** August 22, 2012

(AR BAY11-12.) On April 24, Plaintiff reported "difficulty walking [her] dog." (AR BAY12.) On May 5, Plaintiff reported difficulty with stairs; however, Plaintiff continued to "tolerate[] the treatment well" and "progress[ed] well." (AR BAY12-13.)

12. From April 1, 2008 through June 15, 2008, Plaintiff attended eleven physical therapy sessions at Cardenas and Associates Physical Therapy ("Cardenas"). (AR BAY34-48.) The reports from Cardenas are mixed. On April 1, Plaintiff reported that "daily chores are very difficult," that she "gets worn out [with] cooking," and that "running errands is fatiguing"; however, Plaintiff "tolerated . . . treatment well" and "reported feeling better" afterwards. (AR BAY34.) On April 3 and April 10, Plaintiff "appear[ed] to be feeling better." (AR BAY 39-40.) On April 23, Plaintiff reported "doing better": she had been "more active" and "able to do more around the house," even "a little work in the garden." (AR BAY 42.) However, she woke up "hurting all over." (AR BAY42.) On April 29, Plaintiff had "been feeling good overall." (AR BAY44.) Throughout April, Plaintiff "tolerated the treatment well." (AR BAY38-44.) On May 1, Plaintiff "tolerated the treatment well," "enjoyed the new exercises," and "reported feeling better" afterwards. (AR BAY45.) On June 5 - after not having attending physical therapy at either facility for three weeks - Plaintiff had "regressed": she had "pain all over" and "low energy." (AR BAY46.) However, she had "been able to continue to walk the dogs," though she still reported difficulty with stairs and cognitive ability. (AR BAY46.) On June 11, Plaintiff reported continuing back and shoulder pain. (AR BAY47.) On June 13, Plaintiff reported major pain in her legs and lower back as well as low energy; however, she did some work "around the garage" and "worked a little yesterday and today." (AR BAY48.) Throughout June, she "tolerated the treatment well" and "reported feeling better" afterwards. (AR BAY46-48.)

13. Plaintiff's initial claim and the subsequent administrative appeals process lasted from February 20, 2008 to September 30, 2008. On February 20, Prudential approved Plaintiff's initial claim for STD benefits. (AR BAY50.) On March 12, Prudential requested Plaintiff's medical records. (AR BAY50.) On March 27, Prudential received the medical records, reviewed them, and renewed Plaintiff's STD benefits through April 27. (AR BAY50.) On April 28, Prudential's claim manager informed Plaintiff that "additional medical information was required for an extension of benefits." (AR BAY50.) On May 2, Prudential received the information. (AR BAY50.) On May 7, Prudential determined that it needed to review Plaintiff's job description. (AR BAY50.)

14. Plaintiff's job description specifies that Plaintiff: (1) works 46 hours per week; (2) works indoors 100% of the time; (3) lifts objects eleven to twenty-five times per day; (4) pulls objects one to ten times per day; (5) sits frequently; (6) occasionally stands; (7) occasionally walks; (8) infrequently ascends and descends stairs; (9) infrequently stoops, bends, twists, crawls and reaches above her shoulders; and (10) travels 50% of each month. (AR BAY95-96.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:** <u>CV 10-09150 SJO (MANx)</u>     **DATE:** <u>August 22, 2012</u>

15. Prudential reviewed Plaintiff's job description and medical records, and determined that Plaintiff was capable of doing her job because she "did more strenuous activities at home and during therapy than are required in her sedentary position." (AR BAY50-51.) Accordingly, on May 16, Prudential terminated Plaintiff's STD benefits - effective April 28 - and informed Plaintiff via letter. (AR BAY51.) Plaintiff appealed. (AR BAY51.) On July 14, Prudential reviewed the same records, came to the same conclusion, and informed Plaintiff via letter. (AR BAY51.)

16. Prudential's two termination-of-STD-benefits letters, dated May 16 and July 30, are identical. (AR BAY82-87). Both letters state that: (1) "the additional medical information submitted does not support a period of continued disability"; and (2) "in order to receive benefits[,] covered employees must meet all requirements including the following definition of '[d]isability.'" (AR BAY82, BAY85.) Both letters then restate the entire SPD definition for "disability" but place in bold the following segment: "**The possibility of reasonable accommodation or the availability of medication, surgery or other forms of treatment which would permit you to perform your job may be considered . . . in determining disability.**" (AR BAY82, BAY85.) In conjunction with the two prior statements, this bolded text implies that Prudential did not find Plaintiff to be disabled because treatment options - presumably physical therapy and Lyrica - were available to her and would allow her to continue working at her job. Both letters state, "**If you have any objective medical evidence or other documentation to support your claim, it is very important to submit it with your appeal.**" (AR BAY83, BAY86.) Both letters include an appeal request form, which also explains the appeals procedure. (AR BAY84, BAY87.)

17. On July 7, Plaintiff sent her medical records and an appeal request form to the ERC; she wrote on the form that "psychologist notes will be mailed separately." (AR BAY4.) On July 21, Plaintiff sent a separate letter to the ERC in which she stated that she had not sent her psychotherapist records and would send them only upon request "because of their sensitive nature." (AR BAY5.)

18. On August 18, Dr. Bill Hennessey reviewed Plaintiff's medical records at the ERC's request. (AR BAY211-12.) He noted that Plaintiff "is independent in her activities of daily living" and does not require a wheelchair, crutch, or cane. (AR BAY211.) He noted that Plaintiff walks her dog, had worked in the garden in April, and can drive (with an increase in pain after an hour). (AR BAY211.) After reviewing Plaintiff's job description, he concluded that: (1) "[t]here is insufficient evidence of any period of disability in regard to [Plaintiff] performing her sedentary job . . ."; (2) "[Plaintiff's] objective physical findings have been normal"; and (3) without any "physical impairment" or abnormal "objective neuromuscular clinical evaluation," fibromyalgia alone does not constitute a "physical disability." (AR BAY212.)

/ / /

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.:  <u>CV 10-09150 SJO (MANx)</u>           DATE:  <u>August 22, 2012</u>

19. On September 15, 2008, the ERC denied Plaintiff's administrative appeal and informed Plaintiff via letter. (AR BAY1.) In the letter (dated September 30, 2008), the ERC explained that it considered Plaintiff's medical records, the medical information that Prudential submitted, and Dr. Hennessey's "independent review." (AR BAY1.) The letter explains, "[T]o be eligible for [STD] benefits you must, among other things, show that, based on objective medical evidence of your illness or injury, you are unable to do your job." (AR BAY1.) The letter then notes Hennessey's finding that Plaintiff's "objective physical findings have been normal." (AR BAY1.) The letter notes Hennessey's finding that "evidence in [Plaintiff's] medical records" shows that she is capable of doing her job "without any physical restriction or disability." (AR BAY1.) Finally, the letter notes that the ERC denied the appeal because it "accepted the independent review of Dr. Hennessey." (AR BAY1.) The letter also informs Plaintiff of her right to bring an action against Defendant. (AR BAY2.)

20. Plaintiff attached an exhibit to her Responding Brief: a printout from Pfizer's website that details the use of Lyrica for the treatment of fibromyalgiac pain. (*See generally* Pl.'s Responding Br. Ex. 1 (the "Lyrica Information"), Apr. 9, 2011, ECF No. 17-1.) Plaintiff also attached an exhibit to her Reply Brief: a note from Dr. Yip dated April 17, 2012. (*See generally* Pl.'s Reply Br. Ex. 2 (the "Dr.'s Note"), Apr. 23, 2012, ECF No. 18-1.) In the brief note, Dr. Yip states that "[Plaintiff] was disabled on May of 2008 due to fibromyalgia." (Dr.'s Note 1.) He then states that the diagnosis "was made on the basis of her constellations [sic] of symptoms[:] widespread pain, incapacitating fatigue, anxiety, depression[,] and the presence of 16 [t]rigger points out of 18." (Dr.'s Note 1.)[3]

II. CONCLUSIONS OF LAW

   A. <u>Standard of Review</u>

1. Under section 502 of ERISA, a beneficiary or plan participant may sue "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B) (2009). "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "[I]f the plan *does* confer discretionary authority as a matter of contractual agreement, then the standard

---

[3] Defendant objects to both the Lyrica Information and the Dr.'s Note. (*See generally* Def.'s Written Objection to Evidence Submitted by Pl., Apr. 23, 2012, ECF No. 19; Def.'s Written Objection to Evidence Submitted by Pl. on Reply Br., Apr. 27, 2012, ECF No. 22.) These objections are OVERRULED. *See infra* Conclusions ¶¶ 16-19.

of review shifts to abuse of discretion." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (en banc).  This conferring of discretionary authority must be unambiguous.  *Id.*

2. Because the Plan's unambiguous language grants discretion to the ERC, the Court is obliged to review the ERC's denial of STD benefits for an abuse of discretion.  The Plan expressly provides that Bayer has: (1) "the exclusive discretionary right to interpret the terms and provisions of the Plan[]"; (2) "the exclusive right to make any finding of fact necessary or appropriate . . . [for] the determination of the eligibility for . . . any benefit payable under the Plan[]"; and (3) the right to appoint individuals "to act on its behalf." (Plan Articles BAY256-57.)  The Court concludes that Bayer has appointed BCBS to act on its behalf as administrator of the Plan with full discretionary authority.  (*See* ERC Articles BAY430.)  The Court concludes that BCBS organized the ERC to adjudicate administrative appeals for benefits under the Plan, and that the ERC wields BCBS's full discretionary authority.  (*See* ERC Articles BAY430, BAY434.)  This discretionary authority includes the right to determine if an employee is disabled and the right to determine which opinion "more plausibly or credibly assesses" the employee's condition if conflicting medical opinions exist.  (SPD BAY354.)

3. Accordingly, the Plan gives the ERC "*discretionary authority* to determine eligibility for benefits," and the Court must review the ERC's exercise of that discretion under an abuse of discretion standard.  *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008).  The ERC's final decision is the salient issue because the ERC's administrative appeals process is a de novo review of Prudential's initial evaluation and has ultimate binding authority. (*See* ASA BAY391; ERC Articles BAY430, BAY434; SPD BAY354.)

   B.   Structural Conflict of Interest Informs Abuse of Discretion Standard

4. "[A] deferential standard of review also does not mean that the plan administrator will always prevail on the merits."  *Conkright v. Frommert*, --- U.S. ----,130 S. Ct. 1640, 1644 (2010).  Rather, "[i]t means only that the plan administrator's interpretation 'will not be disturbed if reasonable.'" *Id.* (quoting *Firestone*, 489 U.S. at 111).  The reasonableness of an interpretation can vary based upon the degree of skepticism that accompanies abuse of discretion review.  *See Abatie*, 458 F.3d at 967.

5. Plaintiff argues that the Court should use a "modified abuse of discretion" standard of review because of Bayer's structural conflict of interest.  (Pl.'s Opening Br. 5.)  Plaintiff contends that a structural conflict of interest exists because: (1) Bayer has the exclusive right to determine eligibility for benefits; (2) Bayer must fund all successful benefits claims; (3) Bayer has a corporate purpose of generating profit; and (4) Bayer simultaneously has a fiduciary duty to protect the interests of plan participants.  (Pl.'s Opening Br. 5.)  Plaintiff additionally argues that: (1) the existence of the ERC does not eliminate a conflict of

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.: CV 10-09150 SJO (MANx)    DATE: August 22, 2012

      interest, per *Burke v. Pitney Bowes Inc. Long Term Disability Plan*, 544 F.3d 1016 (9th Cir. 2008); and (2) Defendant took no "affirmative steps" to reduce the bias of the ERC Members who made the decision. (Pl.'s Responding Br. 2-4.)

6.    Defendant contends that the Court should not "heighten" the abuse of discretion standard because Bayer has "[sought] to eliminate any potential conflict." (Def.'s Opening Br. 9.) Defendant contends that no structural conflict of interest exists because the ERC's "status 'as an arm of the employer'" is not sufficient to show a conflict of interest under *Jordan v. Retirement Committee of Rensselaer Polytechnic Institute,* 46 F.3d 1264 (2d Cir. 1995). (Def.'s Opening Br. 10.)

7.    In *Abatie*, the Ninth Circuit specifically addressed structural conflicts of interest and their effect on the abuse of discretion standard of review:

> We read *Firestone* to require abuse of discretion review whenever an ERISA plan grants discretion to the plan administrator, but a review informed by the nature, extent, and effect on the decision-making process of any conflict of interest that may appear in the record. This standard applies to the kind of inherent conflict that exists when a plan administrator both administers the plan and funds it . . . .

      *Abatie*, 458 F.3d at 967. This "informed review" is case-specific. *Id.*

8.    Here, Bayer simultaneously funds and administers the Plan. (Plan Articles BAY256.) Thus, a structural conflict of interest exists. *Abatie*, 458 F.3d at 967. That the ERC makes the decision - rather than Bayer - cannot eliminate this conflict. Plaintiff's reliance on *Burke* is apt; Defendant's reliance on *Rensselaer* is misplaced. *Burke* is a binding Ninth Circuit case that cites the landmark ruling in *Abatie*, *Burke* 544 F.3d at 1014; *Rensselaer* is a non-binding Second Circuit case that predates *Abatie* by more than a decade and squares poorly with it, *see Rensselaer*, 46 F.3d at 1274. Because a structural conflict of interest exists, the Court must apply an "informed" abuse of discretion standard. *See Abatie*, 458 F.3d at 967.

9.    Certain negative conflict factors increase the degree of skepticism that informs abuse of discretion review: (1) "evidence of malice, of self-dealing, or of a parsimonious claims-granting history"; (2) "inconsistent reasons for denial"; (3) "fail[ure to] adequately . . . investigate a claim or ask the plaintiff for necessary evidence"; (4) "fail[ure] to credit a claimant's reliable evidence"; or (5) "repeatedly den[ying] benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record." *Abatie*, 458 F.3d at 968-69.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:** <u>CV 10-09150 SJO (MANx)</u>     **DATE:** <u>August 22, 2012</u>

10. Here, one negative conflict factor exists: inconsistent reasons for denial. Prudential's first two termination letters to Plaintiff implied that she was not eligible for STD benefits because the "possibility of reasonable accommodation or the availability of medication, surgery or other forms of treatment" would allow her to do her job. (AR BAY82, BAY85.) However, the ERC's final termination letter stated that Plaintiff was not eligible for STD benefits because her "objective physical findings" were normal and because "evidence in [her] medical records" showed that she was capable of doing her job "without any physical restriction or disability." (AR BAY1.) The final letter makes no mention of treatment or medication. (AR BAY1.) Thus, Defendant's reasons for denial are inconsistent. The existence of this single negative conflict factor increases the degree of skepticism that informs the Court's abuse of discretion review. *See Abatie*, 458 F.3d at 968.

11. No other negative conflict factors exist. There is no evidence of malice, of self-dealing, or of a parsimonious claims-granting history. (*See generally* AR.) There is no evidence of repeatedly denying benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record. (*See generally* AR.) There is no evidence of a failure to adequately investigate a claim or ask the plaintiff for necessary evidence: on the contrary, Prudential and the ERC requested medical information from Plaintiff on at least four occasions. (AR BAY50, BAY83-84, BAY86-87.) There is no evidence of a failure to credit a claimant's reliable evidence. Indeed, the ERC considered all the information that Plaintiff submitted. (AR 1.)

12. Certain positive conflict factors decrease the degree of skepticism that informs abuse of discretion review: (1) the use of "truly independent medical examiners"; (2) the use of a "neutral, independent review process"; (3) a lack of "incentives to deny claims"; (4) consistent interpretation of the plan among patients; or (5) the "minimiz[ation] [of] any potential financial gain through structure of [the] business (for example, through a retroactive payment system)." *Abatie*, 458 F.3d at 969 n.7.

13. Here, one positive conflict factor exists: a lack of incentives to deny claims. Plaintiff's argument that Defendant has taken no affirmative steps to decrease the bias of ERC Members is unpersuasive. Although ERC Members are ostensibly BCBS employees or directors, they are not compensated for their services to the ERC. (ERC Articles BAY432.) Thus, ERC Members have no individual incentives to deny claims. The existence of this positive conflict factor decreases the degree of skepticism that informs the Court's abuse of discretion review. *See Abatie*, 458 F.3d at 968.

14. No other positive conflict factors exist. Although the ERC describes Dr. Hennessey as having conducted an "independent review" (AR BAY1), there is insufficient evidence that he is a **truly** independent medical examiner. There is no evidence of a neutral, independent review process because the ERC's appeals process is inherently non-neutral given the structural conflict of interest. (ASA BAY381-426; Plan Articles BAY 256.) There

is no evidence of consistent interpretation of the Plan among patients, or of minimization of any potential financial gain through the structure of the business. (*See generally* AR.)

15. The presence of one positive conflict factor does not nullify the total conflict of interest. The inconsistent reasons for denial increase the degree of skepticism that informs abuse of discretion review. Although a lack of financial incentives to deny claims diminishes that skepticism, it cannot negate the existence of the structural conflict. Thus, the Court's review for abuse of discretion must be informed by an additional degree of skepticism.

   C.   Review of the Administrative Record

16. "Judicial review of an ERISA plan administrator's decision on the merits is limited to the administrative record." *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 632 (9th Cir. 2009). "In the ERISA context, the 'administrative record' consists of 'the papers the insurer had when it denied the claim.'" *Montour*, 588 F.3d at 632 n.4 (quoting *Kearney*, 175 F.3d at 1086).[4] However, in *Abatie,* the Ninth Circuit held that a district court may sometimes consider extrinsic evidence: "Even when procedural irregularities are smaller [] and abuse of discretion review applies, the court may take additional evidence when the irregularities have prevented full development of the administrative record. [Thus,] the court may, in essence, recreate what the administrative record would have been had the procedure been correct." *Abatie*, 458 F.3d at 972-73.

17. Here, Plaintiff offers extrinsic evidence: the Lyrica Information and the Dr.'s Note. *See supra* Findings ¶ 20. Defendant objects to the Lyrica Information because it is not part of the AR. (Def.'s Written Objection to Evidence Submitted by Pl. 1-2.) Defendant objects to the Dr.'s Note because it did not exist at the time that the AR was created. (Def.'s Written Objection to Evidence Submitted by Pl. on Reply Br. 3.) Plaintiff argues that the Dr.'s Note is admissible as extrinsic evidence because Defendant's lack of "good faith communication" during the appeals process foreclosed the possibility of the note being written at the time. (*See generally* Pl.'s Response to Def.'s Second Objection to Evidence Submitted by Pl., Apr. 30, 2012, ECF No. 24.)

18. The record shows that there were several procedural irregularities and substantive problems during the appeals process. *See infra* Conclusions ¶¶ 20-32. These problems include an inadequate "meaningful dialogue": "In simple English, what [ERISA] calls for is a meaningful dialogue between ERISA plan administrators and their beneficiaries." *Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997). While the first two termination letters that Plaintiff received found her ineligible for disability benefits based on one reason, the final denial letter found her ineligible for entirely different - and previously

---

[4] Thus, the **complete** administrative record in the instant case includes the AR, SPD, ASA, Plan Articles, and ERC Articles.

undisclosed - reasons. (AR BAY1, BAY82-87); *see supra* Findings ¶¶ 16, 19. In addition, the first two termination letters implied reasons for Plaintiff's denial rather than explicitly stating them. (AR BAY82-87.) Thus, Plaintiff is correct: an inadequate meaningful dialogue prevented the full development of the AR. Defendant's argument that the Dr.'s Note did not exist at the time is unpersuasive because an adequate meaningful dialogue during the appeals process could have resulted in the production of both a similar note by Dr. Yip and the Lyrica Information.

19. Accordingly, the errors that occurred during the administrative appeals process require the Court to review the complete administrative record, as well as the Lyrica Information and the Dr.'s Note. *See Abatie*, 458 F.3d at 972-73. Both of Defendant's objections are OVERRULED.

    D.    <u>Abuse of Discretion Factors</u>

        1.    <u>Procedural Irregularities</u>

20. "A procedural irregularity, like a conflict of interest, is a matter to be weighed in deciding whether an administrator's decision was an abuse of discretion." *Abatie*, 458 F.3d at 972.

            a.    <u>Remedies for Procedural Irregularities</u>

21. "Under ERISA, however, no great wall divides procedural from substantive violations. Although reporting and disclosure requirements are arguably procedural, it is these procedural requirements that alter the very balance of knowledge and rights between covered employees and their employer." *Blau v. Del Monte Corp.*, 748 F.2d 1348, 1353 (9th Cir. 1985) (*abrogated on other grounds by Firestone*, 489 U.S. at 101). Thus, "[s]ubstantive remedies are available for procedural defects under ERISA only when the defects 'caused a substantive violation or themselves worked a substantive harm.'" *Hancock v. Montgomery Ward Long Term Disability Trust*, 787 F.2d 1302, 1308 (9th Cir. 1986) (quoting *Ellenburg v. Brockway, Inc.*, 763 F.3d 1091, 1096 (9th Cir. 1985)). Indeed, "the failure to comply with ERISA's procedural requirements [does not] compel[] an award of employee benefits." *Parker v. BankAm. Corp.*, 50 F.3d 757, 768-69 (9th Cir. 1995) (citing *Blau*, 748 F.2d at 1953).

            b.    <u>Irregularity: Lack of Specific Reasons for Adverse Determination</u>

22. Under ERISA, a notification of adverse benefit determination must include "[t]he specific reason or reasons for the adverse benefit determination." 29 C.F.R. § 2560.503-1(g)(1)(i).

///

Case 2:10-cv-09150-SJO -MAN   Document 26    Filed 08/22/12   Page 12 of 20   Page ID
 #:590

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.:   **CV 10-09150 SJO (MANx)**              DATE:  **August 22, 2012**

23. Here, Defendant failed to explain clearly its specific reasons for the initial termination of Plaintiff's STD benefits.  Prudential's first two (identical) termination letters to Plaintiff state only: "in order to receive benefits[,] covered employees must meet all requirements including the following definition of '[d]isability.'" (AR BAY82, BAY85.)  Both letters then restate the entire SPD definition for "disability" but place in bold the following segment: "**The possibility of reasonable accommodation or the availability of medication, surgery or other forms of treatment which would permit you to perform your job may be considered . . . in determining disability.**" (AR BAY82, BAY85.)  The best inference to draw from these statements is that Prudential had terminated Plaintiff's claim because it had determined that her fibromyalgia was treatable, and therefore she was not disabled because she could do her job.  However, that inference is not readily apparent.  This procedural irregularity suggests an abuse of discretion.

        c.      <u>Irregularity: Lack of Description of Additional Materials Required</u>

24. Under ERISA, a notification of adverse benefit determination must include "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary." 29 C.F.R. § 2650.503-1(g)(1)(iii) (2012).

25. Here, Defendant failed to explain clearly what additional materials Plaintiff needed to submit to perfect her STD benefits claim and why they were necessary.  Prudential's first two termination letters to Plaintiff state only: (1) "[T]he additional medical information submitted does not support a period of continued disability"; and (2) "**If you have any objective medical evidence or other documentation to support your claim, it is very important to submit it with your appeal.**" (AR BAY82-83, BAY85-86.)  Although placing the request in bold is helpful, Prudential's request for "objective medical evidence or other documentation" is overbroad and fails to narrow the request adequately.  In addition, the request for "other documentation" is out of step with Defendant's repeated and explicit statements that it would rely exclusively on "objective medical evidence." (AR BAY354; *see generally* AR, SPD.)  Moreover, Prudential failed to explain why this additional information was necessary.[5] (*See* AR BAY82-87.)  This procedural irregularity suggests an abuse of discretion.

        2.      <u>Inadequate Meaningful Dialogue</u>

26. In interpreting ERISA's procedural regulations, the Ninth Circuit explained:

---

[5] "To perfect the claim" is not a sufficient explanation. *See Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 680 (9th Cir. 2011); *infra* Conclusions ¶ 27.

> In simple English, what this regulation calls for is a meaningful dialogue between ERISA plan administrators and their beneficiaries. If benefits are denied in whole or in part, the reason for the denial must be stated in reasonably clear language, with specific reference to the plan provisions that form the basis for the denial; if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it. There is nothing extraordinary about this; it's how civilized people communicate with each other regarding important matters.

*Booton*, 110 F.3d at 1463.

27. Here, Defendant failed to engage in an adequate meaningful dialogue. *See supra* Conclusions ¶¶ 22-25. After reviewing the entire record, the Court concludes that Prudential found Plaintiff was not eligible for STD benefits because it appeared that her physical therapy sessions and Lyrica were treating her fibromyalgia and that she was capable of performing her job functions. (*See generally* AR.) However, Prudential failed to adequately communicate this finding to Plaintiff. Rather than stating explicitly that Prudential had terminated Plaintiff's claim because of the possibility of treatment, Prudential merely implied it. (AR BAY82, BAY85.) Rather than stating explicitly that Plaintiff needed to produce evidence showing that treatment would not allow Plaintiff to return to her job, Prudential made an overbroad request for documents. (AR BAY83, BAY86.) These statements fall short of what "meaningful dialogue" requires. "An administrator does not do its duty under the statute and regulations by saying merely 'we are not persuaded' or 'your evidence is insufficient.'" *Salomaa*, 642 F.3d at 680. This inadequate meaningful dialogue suggests an abuse of discretion.

### 3. Inconsistent Reasons for Denial

28. "The continual shifting of [a] plan's grounds for denial also suggest[s] abuse of discretion." *Salomaa*, 642 F.3d at 679.

29. Here, Defendant offered inconsistent reasons for denial to Plaintiff. Although Prudential's first two termination letters to Plaintiff imply that the reason for termination of her claim was the possibility of treatment or medication, the ERC's final denial of Plaintiff's appeal does not mention "treatment" or "medication" at all. (AR BAY1-2, BAY82-87.) Rather, the ERC's final denial letter relies on Dr. Hennessey's assessment of Plaintiff's medical records: specifically, that Plaintiff's "objective physical findings" were normal and that Plaintiff's medical records showed that she "could participate in [her] job duties without any physical restriction." (AR BAY1.) Although the ERC was entitled to rely on Dr. Hennessey's opinion, the ERC nonetheless proffered two novel reasons for denying Plaintiff's administrative appeal, while also failing to state the prior reason for termination that

Prudential had implied twice over. The adoption of new reasons and the abandonment of old reasons - regardless of intent - suggests an abuse of discretion.

### 4. New Reasons for Denial Proffered After Final Appeal

30. "[A]n administrator that adds, in its final decision, a new reason for denial, a maneuver that has the effect of insulating the rationale from review, contravenes the purpose of ERISA. This procedural violation must be weighed by the district court in deciding whether [a plan] abused its discretion." *Abatie*, 458 F.3d at 974. Furthermore, "[a] court err[s] by refusing to consider the additional evidence" that a plaintiff offers at trial if the defendant proffered a new reason for the denial at the final stage that the plaintiff had no chance to rebut. *Id.*

31. Here, Defendant offered to Plaintiff three new reasons for denial after her final appeal, which she had no opportunity to rebut because they had never appeared in Prudential's previous communications: (1) an examination of Plaintiff's medical records showed normal "objective physical findings"; (2) Plaintiff was "independent in [her] daily living activities," given that she could walk her dog and drive her car; and (3) Plaintiff was capable of "participat[ing] in [her] job duties without any physical restriction." (AR BAY1.) The ERC was entitled to rely on Dr. Hennessey's newly-acquired opinion, but to offer Plaintiff three new reasons for the denial without having given her an opportunity to address them suggests an abuse of discretion.

32. Because Plaintiff had no opportunity to rebut these three new reasons for the denial of her claim for STD benefits, the Court is obliged to consider the extrinsic evidence that Plaintiff has offered at trial: the Lyrica Information and the Dr.'s Note. *Abatie*, 458 F.3d at 974; *see supra* Conclusions ¶¶ 16-19. To fail to consider these documents would undermine the purpose of ERISA and deprive Plaintiff of a "full and fair review" of her claim. *See Abatie*, 458 F.3d at 974.

### 5. Failure to Review Psychotherapy Documents

33. Plaintiff also argues that Defendant's failure to review her psychotherapy records constitutes an abuse of discretion. (Pl.'s Opening Br. 7-8.) "To deny the claim without explanation and without obtaining relevant information is an abuse of discretion." *Booton*, 110 F.3d at 1064.

34. Here, Plaintiff - not Defendant - is responsible for Defendant's failure to review her psychotherapy records. Although Prudential's first two termination letters to Plaintiff were overbroad in their requests for documentation, the letters undeniably requested "**any objective medical evidence**" to support Plaintiff's claim. (AR BAY82, BAY85.) The ERC's appeal request form, attached to the same termination letters, similarly requested "**any

**objective medical evidence**."  (AR BAY84, BAY87.)[6]  Plaintiff recognized that this objective medical evidence might include psychotherapy records; she even wrote on her appeal request form - dated July 7, 2008 - that "psychologist notes will be mailed separately."  (AR BAY4.)  Two weeks later on July 21, Plaintiff apparently changed her mind and wrote in a separate letter, "[T]he documentation from my psycho therapist I have not [provided].  This documentation can be provided to you upon request because of their [sic] sensitive nature."  (AR BAY5.)  Plaintiff clearly recognized that her psychotherapy records might constitute the "objective medical evidence" requested, yet she nonetheless erected an unnecessary barrier between the ERC and the documents.  Plaintiff is responsible for this problem, and the Court will not reward her for creating it.[7]  Thus, the failure to review Plaintiff's psychotherapy records does not suggest an abuse of discretion.

   6.   Adequacy of Dr. Hennessey's Review

35. Plaintiff argues that the ERC's reliance on Dr. Hennessey's review of her medical records constitutes an abuse of discretion.  Specifically, Plaintiff contends that: (1) Dr. Hennessey "believes that 'by definition' people with fibromyalgia are not disabled" (Pl.'s Opening Br. 9); and (2) Dr. Hennessey is not qualified to opine as to Plaintiff's fibromyalgia because he is not a fibromyalgia specialist.  (Pl.'s Responding Br. 8-9.)  In support of this argument, Plaintiff cites to *Benecke v. Barnhart*, 379 F.3d 587 (9th Cir. 2004).  *See id.* at 594 n.4 ("Each rheumatologist's opinion is given greater weight than those of the other physicians because it is an 'opinion of a specialist about medical issues related to his or her area of specialty' . . . .  Rheumatology is the relevant specialty for fibromyalgia." (quoting 20 C.F.R. § 404.1527(d)(5)) (2012).

36. Here, the ERC's reliance on Dr. Hennessey's review does not suggest an abuse of discretion because Dr. Hennessey opined only that in the absence of other debilitating factors, fibromyalgia by itself does not constitute a disability.  (*See* AR BAY212.)  This opinion is in line with what the Ninth Circuit has recognized about fibromyalgia's amorphous nature:

> Reasonable people can disagree on whether [plaintiff] was "disabled" for purposes of the ERISA plan . . . . Physicians have various criteria, some objective, some not, for evaluating

---

[6] Furthermore, a prior pre-termination letter that Prudential had sent on April 4 defined "objective medical evidence" as "[d]iagnostic test results," "[p]hysical exam findings," and "[o]ffice visit notes."  (AR BAY88-89.)

[7] In addition, under the terms of the Plan, "disability" excludes "employment-related mental or emotional disabilities."  (SPD BAY353.)  Thus, it is unclear how the psychotherapy records would be relevant.

>how severe pain is and whether it is so severe as to be disabling. It is not for an appellate court to decide that fibromyalgia should be treated by ERISA plan administrators as disabling in a particular case. That is a medical and administrative judgment committed to the discretion of the plan administrator based on a fair review of the evidence.

*Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 880 (9th Cir. 2004) (*abrogated on other grounds by Glenn*, 554 U.S. at 105). Whether fibromyalgia disables an individual is open to debate. *Jordan*, 370 F.3d at 880. Dr. Hennessey's opinion is that without additional debilitating factors, fibromyalgia alone is not disabling. (*See* AR BAY212.) His opinion squares with the Plan. Under the terms of the Plan, pain alone - like any condition in isolation - is not sufficient for an employee to be deemed "disabled": the pain must also prevent the employee from doing her job. (*See* SPD BAY354.) After reviewing Plaintiff's medical records - replete with evidence of dog walking, driving, and housework, however painful - Dr. Hennessey concluded that Plaintiff was capable of doing the work required by her job description. (AR BAY211-12; *see also* AR BAY7-14, BAY34-48, BAY95-96.) The ERC was entitled to rely on Dr. Hennessey's opinion as a physician. (ERC Articles BAY434); *see supra* Findings ¶ 6. Furthermore, the ERC had the discretion to determine that Dr. Hennessey's opinion "more plausibly or credibly assesse[d]" Plaintiff's condition than Dr. Yip's opinion. (SPD BAY354); *see supra* Findings ¶ 7. Thus, the ERC's reliance on Dr. Hennessey's review does not suggest an abuse of discretion.

37. In addition, Plaintiff's reliance on *Benecke* is misplaced. Plaintiff offers *Benecke* for the rule that a specialist's opinion carries more weight than a generalist's opinion. 379 F.3d at 594 n.4. However, because *Benecke* is a social security benefits case, it is not controlling in the ERISA context. *See generally Benecke*, 379 F.3d at 587. Even if *Benecke* were controlling here, Plaintiff's reliance would still be misplaced: although Dr. Hennessey's speciality is "physical medicine and rehabilitation" (AR BAY212), Dr. Yip's specialty is "internal medicine." (AR BAY5.) Neither physician is a rheumatologist. Thus, under *Benecke*, both reviews would be entitled to equal weight. 379 F.3d at 587.

    E.    <u>Abuse of Discretion</u>

38. Even taking into account the additional degree of skepticism that informs the Court's review, the evidence in the complete administrative record, when viewed as a whole, shows that Defendant did not abuse its discretion in finding that Plaintiff was not disabled and denying her claim for STD benefits.

///

    1.    <u>Sufficient Evidence that Plaintiff Could Do Her Job</u>

39. Sufficient evidence in the AR shows that the ERC could have reasonably found that Plaintiff could do her job. *See supra* Findings ¶¶ 10-12, 15, 18.  Plaintiff tolerated her physical therapy treatments well and progressed well with both her physical therapists. (AR BAY10-13, BAY34, BAY38-48.) Plaintiff reported that the treatments and medication made her feel better. (AR BAY11, BAY26, BAY34, BAY39-40, BAY44-45.) Plaintiff was able to walk her dogs.  (AR BAY12, BAY46.)  Plaintiff was able to do housework and gardening. (AR BAY42, BAY48.) That Plaintiff often felt significant pain or that the evidence in the AR is mixed - sometimes she could do these tasks, and sometimes she could not - is not dispositive.  (*See generally* AR.)  Substantial evidence in the AR shows that Plaintiff was capable of doing these tasks.

40. That Plaintiff was capable of doing these tasks - participating in physical therapy, walking her dogs, doing housework - is the crux of the matter.  Under the terms of the Plan, fibromyalgiac pain alone is insufficient to render an employee "disabled" unless it also prevents the employee from doing her job. (*See* SPD BAY354.)  Here, Dr. Hennessey - the only physician on record to have compared Plaintiff's medical records to her job description - found that she was capable of doing her job. (AR BAY211-12.) The ERC was entitled to rely on Dr. Hennessey's opinion (ERC Articles BAY434), and the ERC had the authority to determine that his opinion credibly assessed Plaintiff's condition (SPD BAY354). Thus, even viewing the record with an additional degree of skepticism, the Court concludes that the ERC could have reasonably found that: (1) Plaintiff could do her job; and (2) Plaintiff therefore was not disabled under the terms of the Plan.

    a.  Plaintiff's Extrinsic Evidence

41. Because the ERC offered inadequate meaningful dialogue and offered new reasons for the denial of Plaintiff's claims at the conclusion of the administrative appeals process, the Court is obliged to review Plaintiff's extrinsic evidence introduced at trial in order to grant her a fair opportunity to rebut the ERC's new reasons.  *See supra* Conclusions ¶¶ 18-19, 32. In Plaintiff's administrative appeal denial letter, the ERC stated that it had denied her claim because Plaintiff: (1) had normal "objective physical findings"; (2) was "independent in [her] daily living activities," given that she could walk her dog and drive her car; and (3) was capable of "participating in [her] job duties without any physical restriction." (AR BAY1.)

42. To rebut these new reasons for denial, Plaintiff offers the Lyrica Information.  *See supra* Findings ¶ 21. Plaintiff argues that the Lyrica Information is objective evidence that she suffers from fibromyalgia. (Pl.'s Responding Br. 8.)  This assertion is accurate but not dispositive.  Although the ERC's final denial letter states that Plaintiff's "objective physical findings" have been normal, the ERC has never denied that Plaintiff has fibromyalgia. (*See generally* AR.)  Rather, the ERC found that Plaintiff's fibromyalgiac pain was insufficient to prevent her from working at her job.  *See supra* Findings ¶¶ 39-40.  Even if the Lyrica

    Information were to constitute an abnormal "objective physical finding,"[8] it would not show that the ERC was unreasonable in finding that Plaintiff's fibromyalgiac pain - objective or otherwise - was insufficient to prevent her from working at her job.

43.     To rebut these new reasons for denial, Plaintiff also offers the Dr.'s Note. *See supra* Findings ¶ 21. In this document, Dr. Yip states: "[Plaintiff] was disabled on May of 2008 due to fibromyalgia. The diagnosis of fibromyalgia was made on the basis of her constellations of widespread pain, incapacitating fatigue, anxiety, depression and the presence of 16 [t]rigger points out of 18." (Dr.'s Note 1.)

44.     Even if the Court grants Plaintiff every favorable inference, this evidence still cannot show that the Defendant abused its discretion. The Court will assume *arguendo*: (1) that the Dr.'s Note constitutes objective medical evidence[9]; (2) that Dr. Yip actually compared Plaintiff's medical records to her job description[10]; and (3) that Dr. Yip found that Plaintiff's fibromyalgiac pain prevented her from doing her job. Under the terms of the Plan, the ERC reserves the right to determine which physician's opinion "more plausibly or credibly assesses" the employee's condition. (SPD BAY354.) Thus, the ERC would still retain the necessary authority to give Dr. Hennessey's opinion - that Plaintiff was not disabled - more weight than Dr. Yip's opinion. *See supra* Conclusions ¶ 36.

45.     Thus, the Lyrica Information and the Dr.'s Note cannot successfully rebut the new reasons that the ERC offered at the conclusion of the administrative appeals process. This extrinsic evidence does not outweigh the substantial evidence on the AR that supports the ERC's findings: namely, that Plaintiff was capable of doing her job and therefore not disabled. Thus, Plaintiff's extrinsic evidence does not show that Defendant abused its discretion in denying Plainiff's claim for STD benefits.

        b.     <u>Consideration of Extrinsic Evidence</u>

---

[8] Under prevailing Ninth Circuit precedent, the Lyrica Information is probably not objective medical evidence. *See Friedrich v. Intel Corp.*, 181 F.3d 1105, 1111-12 (9th Cir. 1999) (finding that "objective medical evidence" of chronic fatigue syndrome - an amorphous condition similar to fibromyalgia - included testimony by three examining doctors who opined as to the results of several objective tests: "electrocephalograms," "neuropsychological tests," "antinuclear antibody[] readings," "Epstein-Barr tests," and a "SPECT scan").

[9] Under prevailing Ninth Circuit precedent, the Dr.'s Note is probably not objective medical evidence. *See Friedrich*, 181 F.3d at 1111-12.

[10] The AR contains no evidence that Dr. Yip made this comparison. (*See generally* AR.)

46. The Court's consideration of Plaintiff's extrinsic evidence cures the problem of inadequate meaningful dialogue because it "in essence, recreate[s] what the administrative record would have been had the procedure been correct." *Abatie*, 458 F.3d at 973. Had Defendant participated in a meaningful dialogue with Plaintiff, Plaintiff argues that she would have presented Defendant with a document similar to the Dr.'s Note. (*See* Pl.'s Reply Br. 10.) Because the Court has now admitted the Dr.'s Note for consideration, *see supra* Conclusions ¶¶ 18-19, 32, the AR has been recreated as Plaintiff would have it. Thus, any prejudice caused by a lack of meaningful dialogue has been eliminated.

47. For the same reasons, the Court's consideration of Plaintiff's extrinsic evidence also cures the problems of: inconsistent reasons for denial; and new reasons offered for denial at the conclusion of the appeals process. Plaintiff offered extrinsic evidence to address those issues, and the Court considered it. *See supra* Conclusions ¶¶ 18-19, 32, 41-45. By considering that extrinsic evidence, the Court has recreated the full record as Plaintiff would have it. Thus, the inconsistent reasons for denial and the new reasons for denial have no longer harmed Plaintiff. Even if it had considered the extrinsic evidence, the ERC would not have abused its discretion in determining that Plaintiff was not disabled, because the record contains substantial evidence that Plaintiff was capable of doing her job.

    2.  <u>Procedural Irregularities</u>

48. The only remaining factor that suggests an abuse of discretion - Defendant's two procedural irregularities - is insufficient to warrant a finding of an abuse of discretion. "Substantive remedies are available for procedural defects under ERISA only when the defects 'caused a substantive violation or themselves worked a substantive harm.'" *Hancock*, 787 F.2d at 1308 (quoting *Ellenburg*, 763 F.3d at 1096); *see supra* Conclusions ¶ 21. Here, the procedural irregularities were that: (1) Prudential failed to give clear and specific reasons for the termination of Plaintiff's claim; and (2) Prudential failed to explain what additional materials were needed to perfect Plaintiff's claim and why they were needed. *See supra* Conclusions ¶¶ 22-25. These procedural irregularities initially caused a substantive harm because they resulted in an inadequate meaningful dialogue. *See supra* Conclusions ¶ 27. However, the consideration of Plaintiff's extrinsic evidence has cured that inadequacy. *See supra* Conclusions ¶ 46. Thus, any substantive harm from these procedural irregularities has been cured. Therefore, no substantive remedy is available. *See Hancock*, 787 F.2d at 1308.

    3.  <u>Sufficient Evidence that Plaintiff's Condition Was Treatable</u>

49. In addition, Defendant did not abuse its discretion in denying Plaintiff's claim for STD benefits because substantial evidence in the AR shows: (1) that Plaintiff's fibromyalgia was treatable; (2) that her health was improving; and (3) that she could do her job. Under the terms of the Plan, in determining whether an employee is "disabled," the ERC may take into

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.:   **CV 10-09150 SJO (MANx)**          DATE:   **August 22, 2012**

account "the availability of medication . . . or other forms of treatment" that would permit the employee to do her job.  (SPD BAY354); *see supra* Findings ¶ 7; Conclusions ¶¶ 2-3.  Here, Plaintiff's condition showed an overall trajectory of gradual improvement over time. (*See* AR BAY7-48.) Plaintiff tolerated her physical therapy treatments well and progressed well with both of her physical therapists.  (AR BAY10-13, BAY34, BAY38-48.) Plaintiff reported that the treatments and medication made her feel better.  (AR BAY11, BAY26, BAY34, BAY39-40, BAY44-45.) Plaintiff was able to continue to walk her dogs.  (AR BAY12, 46.)  In addition, Plaintiff's only major regression occurred when she failed to attend physical therapy at either Gillette or Cardenas for three weeks.  *See supra* Findings ¶ 12.  Because substantial evidence in the AR shows that Plaintiff's fibromyalgia was treatable and that her health was gradually improving, the ERC did not abuse its discretion in finding that Plaintiff was not disabled.

III.   CONCLUSION

1.   Defendant did not abuse its discretion in finding that Plaintiff was not "disabled" under the terms of the Plan.

2.   Defendant did not abuse its discretion in denying Plaintiff STD benefits.

3.   Defendant shall submit a proposed judgment in accordance with these Findings and Conclusions **on or before September 3, 2012**.

IT IS SO ORDERED.